UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------   X
                                                                :
NIKHILA SUNNY, et al.,                                          :
                                                                :
                                   Plaintiffs,                  :
                                                                :      21-cv-4662 (BMC)
                   -against-                                    :
                                                                :
JOSEPH R. BIDEN, JR., et al.,                                   :
                                                                :
                                   Defendants.                  :
                                                                :
-------------------------------------------------------------   X
                                                                :
VAUGHN WASHINGTON GEORGE                                        :
WILSON, et al.,                                                 :
                                                                :
                                   Plaintiffs,                  :      21-cv-05379 (BMC)
                                                                :
                   -against-                                    :
                                                                :
JOSEPH R. BIDEN, JR., et al.,                                   :
                                                                :
                                   Defendants.                  :
                                                                :
-------------------------------------------------------------   X
```

**MEMORANDUM DECISION AND ORDER**

**COGAN,** District Judge.

The two cases before this Court concern the State Department's discretion to allocate consular and embassy resources to address a substantial backlog in visa applications. This backlog is the result of the COVID-19 global pandemic, which caused the Department to suspend routine visa services on March 20, 2020, and start a phased resumption in July 2020.

Plaintiffs are lawful permanent residents (LPRs) and their spouses and minor children. The minor children and spouses of LPRs are eligible for "Family: Second Preference (A)" visas, commonly referred to as F2As. They seek to preliminarily enjoin part of the State Department's

plan for a phased resumption of visa services because it designates F2As as a third-tier priority and instructs consulates and embassies to dedicate 75% of visa-related appointments to addressing backlogs in Immediate Relative visas, also known as IRs. Because plaintiffs are unable to show that they are likely to succeed on the merits, this Court denies plaintiffs' motion for a preliminary injunction.

## BACKGROUND

I.    **The Immigration and Nationality Act**

"Broadly speaking, a foreign national wishing to enter the United States must first obtain a visa from the State Department. A visa is a travel document that allows its holder to travel to a port of entry and request permission to enter the United States." Gomez v. Trump, 485 F. Supp. 3d 145, 158 (D.D.C. 2020). Immigrant visas (IVs) are issued to foreign nationals intending to relocate permanently to the United States. See United States v. Idowu, 105 F.3d 728, 731 (D.C. Cir. 1997).

The Immigration and Nationality Act (INA) codifies four central tenants of U.S. policy on legal permanent immigration: family reunification; the admission of immigrants with needed skills; the protection of refugees and asylees; and the acceptance of a diverse set of immigrants by country of origin.[1] "Family reunification occurs primarily through family-sponsored immigration. U.S. labor market contribution occurs through employment-based immigration. Humanitarian assistance occurs primarily through the U.S. refugee and asylee programs. Origin-country diversity is addressed through the Diversity Immigrant Visa."[2]

---

[1] William A. Kandel, Congressional Research Service, Permanent Legal Immigration to the United States: Policy Overview 1 (2018).

[2] Id. at i.

The INA, in 8 U.S.C. §§ 1151–1154, provides a rubric for the management of two broad categories of family visas: Immediate Relative (IR); and Family-Sponsored Preference.[3]  IR visas are granted to aliens who are the spouses, unmarried minor children, or parents of adult U.S. citizens.  Family-Sponsored Preference visas are subdivided into five categories: 1st Preference, the unmarried children of U.S. citizens; 2nd Preference (A), spouses and minor children of LPRs; 2nd Preference (B), the unmarried sons and daughters of LPRs; 3rd Preference, married sons and daughters of U.S. citizens; and 4th Preference, siblings of adult U.S. Citizens.[4]

The INA sets the overall limit on the number of IR and Family-Sponsored Preference immigrants at 480,000.[5]  But this is a "permeable cap" because there is no limit on the number of IR visas.  See 8 U.S.C. § 1151(b).  The various categories of Family-Sponsored Preference Immigrants, however, have statutory floors and ceilings based on the INA's overall limit.  The INA provides that the annual level of Family-Sponsored Preference immigrants may not fall below 226,000.  See id. at § 1151(c)(1)(B)(ii).  However, the number of Family-Sponsored Preference visas is capped at 480,000.  The number of Family-Sponsored Preference visas is determined by reducing the total cap (480,000) by the number of IR visas issued, with the understanding that 226,000 Family-Sponsored Preference visas must be issued.  Thus, if the total number of IR visas falls below 254,000 (480,000 - 226,000), the State Department can issue additional Family-Sponsored Preference visas equal to the difference between 254,000 and the number of IR visas.  See id. at § 1151(c)(1)(A).  Until 2020 and the COVID-19 pandemic, this

_____

[3] See id. at 2–3.

[4] See id. at 5.

[5] Id. at 3.

did not occur.  Between 1996 and 2016, the annual issuance of IR visas has always exceeded 254,000.[6]

The INA provides further guidance for how the mandatory 226,000 visas for Family-Sponsored Preference immigrants should be divided among the five preference categories.  This carefully calibrated system is best shown through this table[7]:

| Category | | Numerical Limit |
|---|---|---|
| **Total Family-Sponsored Preference and IR** | | **480,000** |
| IR Visas: spouses and unmarried minor children of U.S. citizens and the parents of adult U.S. citizens | | Unlimited |
| Family-Sponsored Preference Visas: | | 226,000 (Plus unused IR visas, if fewer than 254,000 IR visas are issued) |
| 1st Preference | Unmarried sons and daughters of U.S. citizens | 23,400 (plus unused visas from 4th preference visas) |
| 2nd Preference | A: Spouses and minor children of LPRs (*F2A*) <br><br> B: Unmarried sons and daughters of LPRs | 114,200 (plus unused 1st preference visas with 77% reserved for 2A preference) |
| 3rd Preference | Married sons and daughters of U.S. citizens | 23,400 plus unused 1st or 2nd preference visas |
| 4th Preference | Siblings of adult U.S. citizens | 65,000 plus unused 1st, 2nd, or 3rd preference visas |

Because plaintiffs' concerns center around the prioritization and raw number of Second Preference Family-Sponsored Visas (F2As), it is worth observing from the table above that the INA sets the F2A visa floor at approximately 87,900 – about 77% of 114,200.  See 8 U.S.C. § 1153(a)(2).  From 2016 until 2020, the required floor for F2A visas was met.  See Department of Homeland Security, Legal Immigration and Adjustment of Status Report Quarterly Data,

---

[6] Id. at 4.

[7] Id. at 5.

available at https://www.dhs.gov/immigration-statistics/readingroom/special/LIASR (last visited Nov. 11, 2021).

II.    <u>The COVID-19 Backlog and The State Department's Response</u>

Prior to the pandemic, in the calendar year of 2019, on average 60,866 visa applicants were backlogged, pending the scheduling of an interview, each month.  U.S. Department of State, National Visa Center Immigrant Visa Backlog Report (2021), available at https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html. As of October 31, 2021, that backlog was documented as 490,089.  <u>Id.</u>

This dramatic increase in the number of individuals who are documentarily complete and still awaiting an interview exists because of the pandemic.  On March 20, 2020, the State Department suspended routine visa services at consular offices and embassies worldwide.  For approximately four months, only "emergency and mission critical" visa services were permitted to proceed.

Starting on July 8, 2020, the State Department began a phased reopening of routine consular services.  This reopening provided Consular Chiefs with the discretion to determine the volume of visa services their offices could resume given local conditions and restrictions, including local and national lockdowns; travel restrictions; host country quarantine regulations; and internal foreign post policies designed to contain the spread of COVID-19.  These guidelines also emphasized that a consulate and embassy's policy decisions should prioritize "[t]he health and safety of consular teams, mission colleagues, and applicants for consular services."  20 STATE 110220, Expanded Guidance on Prioritization for the Phased Resumption of Routine Visa Services, at 1 (Nov. 12, 2020).

During this period, the total number of family preference visas issued by embassies and consular offices dropped from approximately 191,938 in 2019 to 90,435 in 2020. Compare U.S. Department of State – Bureau of Consular Affairs, Report of the Visa Office (2019) (Table VI: Preference Visas Issued Fiscal Year 2019) with U.S. Department of State – Bureau of Consular Affairs, Report of the Visa Office (2020) (Table VI: Preference Visas Issued Fiscal Year 2020). These State Department reports also show that the number of F2A visas issued at foreign posts dropped from 63,890 in 2019 to 26,154 in 2020.

A similar decline occurred in IR visas. In 2019, the Department's consulates and embassies issued 186,584 IR visas. U.S. Department of State – Bureau of Consular Affairs, Report of the Visa Office (2019) (Table XII: Immediate Relative Visas Issued Fiscal Year 2019). But in 2020, only 108,292 were issued. U.S. Department of State – Bureau of Consular Affairs, Report of the Visa Office (2020) (Table XII: Immediate Relative Visas Issued Fiscal Year 2020).

The impact of the pandemic on consular issued visas is clearly demonstrated by the table below, created using data from the State Department's Bureau of Consular Affairs[8]:

| 2018 – 2019 | IVs Issued | FY 2020 – 2021 | IVs Issued |
|---|---|---|---|
| March 2018 | 46,706 | March 2020 | 24,383 |
| April 2018 | 46,399 | April 2020 | 4,412 |
| May 2018 | 45,036 | May 2020 | 697 |
| June 2018 | 43,756 | June 2020 | 1,521 |
| July 2018 | 42,405 | July 2020 | 1,567 |
| August 2018 | 46,511 | August 2020 | 6,100 |
| September 2018 | 38,788 | September 2020 | 14,894 |
| October 2018 | 41,692 | October 2020 | 8,687 |
| November 2018 | 38,653 | November 2020 | 10,138 |
| December 2018 | 35,750 | December 2020 | 11,233 |
| January 2019 | 39,557 | January 2021 | 11,880 |
| February 2019 | 34,710 | February 2021 | 13,202 |
| March 2019 | 37,618 | March 2021 | 21,670 |

[8] U.S. Department of State, Bureau of Consular Affairs: Monthly Immigrant Visa Issuance Statistics, available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/immigrant-visa-statistics/monthly-immigrant-visa-issuances.html (last visited Nov. 11, 2021).

| April 2019 | 38,573 | April 2021 | 24,841 |
|---|---|---|---|
| May 2019 | 39,393 | May 2021 | 26,204 |
| June 2019 | 38,529 | June 2021 | 37,932 |
| July 2019 | 39,568 | July 2021 | 40,005 |
| August 2019 | 38,090 | August 2021 | 45,491 |
| September 2019 | 39,473 | September 2021 | 47,454 |

This table illustrates that by the third quarter (July to September) of 2020, the Department was unlikely to issue enough visas to meet the INA's mandated floors.

There is no evidence that this drop off was caused by a fall in demand for visas. Rather, it is a symptom of the resource constraints caused by the pandemic, as evidenced by the 490,089 documentarily qualified immigrant visa applicants who are still awaiting in-person interviews.

To address this backlog, the State Department issued Guidance Cable 20 STATE 110220 (referred to below as "Guidance 220") on November 12, 2020, directing foreign posts to use a "tiered and hierarchical approach when considering which services to resume and in what numbers." After first ensuring that there were no American citizens in need of services, immigrant visa processing posts were directed to maximize their resources to accommodate as many family-based immigrant visas and fiancé visas as possible. Guidance 220 at 1. The Department's guidance also observed that Congress had set target timelines for several visa categories in its statutory notes. Id. at 1–2. Specifically, the 2003 Foreign Relations Authorization Act, Pub. L. 107–228, § 233(a), provides:

> IN GENERAL – It shall be the policy of the [State] Department to process each visa application from an alien classified as an immediate relative or as a K-1 nonimmigrant within 30 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service. In the case of an immigrant visa application where the petitioner is a relative other than an immediate relative, it should be the policy of the Department to process such an application within 60 days of the receipt of all necessary documents from the application and the Immigration and Naturalization Service.

Based on those timelines, the State Department devised the following visa prioritization:

- Tier One: Immediate relative intercountry adoption visas, age-out cases (cases where the applicant will soon no longer qualify due to their age), certain Special Immigrant Visas (SQ and SI for Afghan and Iraqi nationals working with the U.S. government), and emergency cases as determined on a case-by-case basis.

- Tier Two: Immediate relative visas; fiancé visas; and returning resident visas.

- Tier Three: Family preference immigrant visas and SE Special Immigrant Visas for certain employees of the U.S. government abroad.

- Tier Four: All other immigrant visas, including employment preference and diversity visas.

Guidance 220 at 2. After creating these tiers, a subsequent Department cable, 21 STATE 14702 (referred to below as "Guidance 702"), directed consulates and embassies to "maximize their resources to schedule as many family-based IV and fiancé NIV appointments as possible, focusing on reducing any Immediate Relative visa backlog each month." Guidance 702 then provided more detailed instructions stating: "[p]osts with an IR backlog should still schedule some Family Preference (FP) cases, Employment Preference (EP), and Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case, but allocate at least 75 percent of each month's appointments to backlogged IRs." Id. The Department also recognized that some posts may have embassy or consulate-specific reasons for altering this system. Dkt. No. 21-3 at 11. It, therefore, permitted posts to deviate from the prioritization scheme, if the appropriate permissions were sought and obtained. Id.

### III. Procedural Background

After being placed in Tier Three, plaintiffs, who are awaiting appointments for their F2A visas, brought two actions in this court. They seek to enjoin the Department's tiered approach

via four legal challenges. Plaintiffs contend the Department's prioritization, as outlined by Guidance 220 and Guidance 702 (collectively, the "Guidance Cables"), improperly extends plaintiffs' wait time for visa interviews, and thus: (1) unlawfully circumvents the will of Congress and the law; (2) is arbitrary and capricious; (3) fails to follow the notice and comment procedure required for executive agency rulemaking; and (4) disregards the Department's duty to conduct visa adjudications within a reasonable time. In response, defendants address these challenges on their merits as well as contend that plaintiffs lack standing and the doctrine of consular nonreviewability requires this Court to abstain.

## DISCUSSION

In other contexts, courts have recognized the severe disruptions caused by the novel coronavirus, SARS-CoV-2, and its associated disease, COVID-19, as well as the need for governments, local, state, and federal, to take dramatic steps in response. See, e.g., Dixon v. De Blasio, No. 21-cv-5090, 2021 WL 4750187 (E.D.N.Y. Oct. 12, 2021) (upholding New York City's proof of vaccination requirement for entry into public establishments); Columbus Ale House, Inc. v. Cuomo, 495 F. Supp. 3d 88 (E.D.N.Y. 2020) (upholding "extensive restrictions on business and social activities" as a valid means of limiting virus transmission); Gomez v. Trump, 485 F. Supp. 3d 145 (D.D.C. 2020) (concluding Presidential Proclamation 10014, prohibiting diversity visa selectees from entering the United States with limited exception, was lawful).

In this instance, the COVID-19 pandemic caused an unprecedented backlog in visa adjudications because the State Department prioritized the health and safety of its officers over maintaining its usual visa schedule. Now, the Department has only tough choices and no silver bullets. The data demonstrates that the government will very likely fail to meet multiple required INA quotas. At this juncture, the question is not whether all the INA's visa floors will be met,

but rather which quotas will be unfilled.  In these circumstances, courts have observed that "[t]he agency is in a unique – and authoritative – position to . . . allocate its resources in the optimal way."  In re Barr Laboratories, Inc., 930 F.2d 72, 76 (D.C. Cir. 1991); cf. W. Coal Traffic League v. Surface Transp. Bd., 216 F.3d 1168, 1175 (D.C. Cir. 2000) (finding delay in an adjudication appropriate because the defendant agency had the discretion to set its own priorities and was required to both complete merger reviews expeditiously and determine the effect of the transaction on public transportation).

## I.    Standing

The Court begins with the threshold question of whether plaintiffs' claims are justiciable. Because Article III standing is always an antecedent question, the Court must address the issue of jurisdiction before turning, as necessary, to the parties' other positions.  Cf. Wong v. CKX, Inc., 890 F. Supp. 2d 411, 414–15 (S.D.N.Y. 2012) ("When presented with a motion under Rule 12(b)(1) to dismiss . . . and Rule 12(b)(6) to dismiss . . . the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has subject matter jurisdiction necessary to consider the merits of the action.").

Plaintiffs have standing to challenge the State Department's tiered approach to visa services and its present policy that, at a minimum, 75% of consular and embassy visa interview appointments be used to reduce the IR-visa backlog.  Because the Department's policy dedicates only 25% of foreign visa appointments to the third and fourth tiers of its scheme, plaintiffs will now have to wait longer for their appointments.  This is a concrete injury directly traceable to the Department's decision and this Court could remedy the alleged injury with an injunction.

"Article III restricts federal courts to the resolution of cases and controversies."  Davis v. FEC, 554 U.S. 724, 732 (2008).  "That restriction requires that the party invoking federal

jurisdiction have standing – the 'personal interest that must exist at the commencement of the litigation.'" Id. To obtain injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability. See Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). When a case involves more than one plaintiff, "the court need only find one plaintiff who has standing." Mendoza v. Perez, 754 F.3d 1002, 1010 (D.C. Cir. 2014); see also Massachusetts v. EPA, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.").

Defendants cite to Jacob v. Biden, No. 21-cv-261, 2021 WL 2333853, at *7 (N.D. Cal. June 8, 2021), for the proposition that "there is no effective relief which the Court may provide that is tailored to the legal harm." Defendants adopt this position because they believe any attempt to redress the delays in obtaining visa interviews would inequitably move plaintiffs to the front of the visa line and other applicants to the back. Next, defendants argue that plaintiffs' claims fail to tie their injury to the Department's policy because an array of factors could be causing plaintiffs' interviews to be delayed. Both these positions fail.

Courts, including district courts within this Circuit, have recognized family separation as a form of injury. See, e.g., Washington v. Trump, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying the separation of families as a substantial injury and even an irreparable harm); Martinez v. McAleenan, 385 F. Supp. 3d 349, 371 (S.D.N.Y. 2019) ("courts recognize the irreparable harms that stem from being unlawfully separated from family"). Given that one of the INA's four primary policy objectives is family reunification, it stands to reason that a policy that hinders this objective necessarily causes injury.

Here, plaintiffs directly challenge a Department policy requiring consulates and embassies to prioritize IR visa processing over F2As. Plaintiffs stress that they do not want an

injunction which provides them with preference or orders the State Department to expedite its processes. Rather, plaintiffs only seek to challenge a tiered system which they believe arbitrarily, and counter to the INA, dedicates fewer resources to processing their visas.

An injunction in this instance would not move plaintiffs to the front of the line. Rather, it would merely remove the tiered system plaintiffs believe is hindering the timely adjudication of their visa applications. As a result, an injunction removing the State Department's tiered system is within this Court's ability and sufficient to address plaintiffs' injury. Cf. Young v. Trump, 506 F. Supp. 3d 921, 936 (N.D. Cal. 2020) (standing doctrine's redressability requirement met when an injunction would remove an administration policy freezing the visa process); see generally Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 151–53 (2010) (finding that an injunction in the context of a multi-faceted litigation was appropriate because the relief sought did not resolve the whole case but did constitute a first step in addressing a specific injury).

This remedy is bolstered by sufficient facts tying plaintiffs' injury to the Department's policy. The number of IR visas issued in the first half of 2021 has steadily increased, approaching pre-pandemic levels, while the number of F2A visas has remained at historically low levels. Given the tiered structure outlined by the Department's cables, which dedicate substantially more resources to issuing IR visas, and the facts proffered by plaintiffs, it is evident that plaintiffs' injury is fairly traceable to defendants' policy. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); cf. Young, 506 F. Supp. 3d at 936 (finding the causation element of standing met in plaintiffs' challenge to a policy temporarily halting visa adjudications).

Thus, plaintiffs have shown sufficient injury, causation, and redressability to meet Article III's standing requirements.

## II.    Consular Non-Reviewability

Defendants also challenge plaintiffs' claims by raising the doctrine of consular non-reviewability.  They site a deluge of case law and argue this Court is barred from reviewing a State Department policy that merely delays the adjudication of certain visas.  Defendants misread this law.

The doctrine of consular non-reviewability "holds that a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise."  Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999).  The doctrine is rooted in the ancient principle of international law that nation states have the inherent right to exclude or admit aliens, and that such matters are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."  Id. (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 588–89 (1952)).

The cases cited by defendants consider this doctrine in the context of policies concerning the outright exclusion of aliens, see, e.g., Trump v. Hawaii, 138 S. Ct. 2392 (2018) (concerning the exclusion of foreign nationals from seven countries); Alharbi v. Miller, 368 F. Supp. 3d 527 (E.D.N.Y. 2019) (concerning an embassy's decision to refuse a group of Yemeni immigrants' visas based on Presidential Proclamation 9645, barring individuals from Yemen), discrete consular adjudications declining to grant a visa, and an individual consular officer's decision to defer or postpone a visa adjudication, see, e.g., Abdo v. Tillerson, No. 17-cv-7519, 2019 WL 464819 (S.D.N.Y. Feb. 5, 2019) (dismissing plaintiff's claim that the State Department "unlawfully" delayed adjudicating plaintiff and his son's visa application); Al Naham v. U.S. Dep't of State, No. 14-cv-9974, 2015 WL 3457448 (S.D.N.Y. June 1, 2015) (granting defendants' motion to dismiss because the doctrine of consular non-reviewability prevented the

court from addressing a consulate's prolonged postponement of a family's visa decision); Castillo v. Rice, 581 F. Supp. 2d 468 (S.D.N.Y. 2008) (dismissing a challenge to the delay of a visa adjudication on the grounds of consular non-reviewability).

But not every legal challenge that touches on the admission or exclusion of foreign nationals is foreclosed by consular non-reviewability. At least one such exception arises "when [the] suit challenges the authority of the consul to take or fail to take an action as opposed to a decision within the consul's discretion." Rivas v. Napolitano, 714 F.3d 1108, 1110 (9th Cir. 2013) (quoting Patel v. Reno, 134 F.3d 929, 931–32 (9th Cir. 1997); see Mulligan v. Schultz, 848 F.2d 655, 657 (5th Cir. 1988) (finding judicial review appropriate because plaintiff challenged the Secretary of State's authority to place temporal limits on the processing of non-preference visa applications); see also Am. Acad. of Religion v. Chertoff, 463 F. Supp. 2d 400, 421 (S.D.N.Y. 2006) (finding that the "failure to issue or refuse a visa within a reasonable period of time triggers mandamus jurisdiction in federal court"); 22 C.F.R. § 42.81 ("When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA and the implementing regulations, the consular officer must either" issue or refuse the visa under applicable law.).

The present action falls squarely within the exception outlined in both sister circuit and district court case law. Plaintiffs' challenge does not seek to expedite individual cases or litigate a specific deferral. Instead, it aims at enjoining a State Department policy that plaintiffs believe violates the INA and the Administrative Procedures Act. This position contests the Department's authority to promulgate the policy at issue, not the discretionary decisions of the consular and embassy staff who are implementing it.

## III. __Injunction__

In this Circuit, "[a] party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." Am. C.L. Union v. Clapper, 804 F.3d 617, 622 (2d Cir. 2015) (internal quotes and citations omitted). In this instance, the last two factors of this analysis merge because the government is the party opposing relief. See Nken v. Holder, 556 U.S. 418, 435 (2009). Plaintiffs' delay in receiving F2A visas for themselves, their spouses, or their minor children, amounts to irreparable harm. Additionally, the balance of hardships tips in plaintiff's favor. But this court denies plaintiffs' motion for an injunction because they are unlikely to succeed on the merits.

### A. Irreparable Harm

"Irreparable harm 'is the single most important prerequisite' for injunctive relief, and 'in the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied.'" Uppal v. N.Y. State Dep't of Health, 756 F. App'x 95, 96 (2d Cir. 2019) (summary order) (quoting Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable harm is defined as 'certain and imminent harm for which a monetary award does not adequately compensate.'" Allstate Ins. Co. v. Harvey Family Chiropractic, 677 F. App'x 716, 718 (2d Cir. 2017) (quoting Wisdom Imp. Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 113 (2d Cir. 2003)). "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to

resolve the harm." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir.

2009) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)).

As this Court observed in its standing analysis, family separation is a form of injury. The

case law also evinces that prolonged family separation amounts to irreparable injury. See

Washington v. Trump, 847 F.3d at 1169; Martinez, 385 F. Supp. 3d at 371 ("[C]ourts recognize

the irreparable harms that stem from being unlawfully separated from family."); see generally

Make the Rd. N.Y. v. Pompeo, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020); but see Al Saidi v.

U.S. Embassy in Djib., No. 21-cv-3393, 2021 WL 2515772, at *7 (E.D.N.Y. June 18, 2021)

("Further, any delay in processing the Form I-130 applications would not cause a family

separation that might contribute to an irreparable harm because plaintiff-petitioner and plaintiff-

beneficiaries already live in separate countries.").[9]

### B. Balance of Hardships and the Public Interest

The balance of hardships in this case tips only slightly in favor of plaintiffs. The State

Department has a valid interest in applying its preferred immigration policy to best leverage its

limited resources. However, plaintiffs' interest in the timely adjudication of their visas so that

they can be reunited with their families outweighs the drain on State Department resources that

would be necessary to integrate the F2A visas into current Department policy. Moreover, the

Department will eventually need to dedicate its time and resources to adjudicating the F2As visas

currently at issue. Cf. New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 86–87 (2d Cir.

2020) ("Any time the government is subject to a preliminary injunction, it necessarily suffers the

---

[9] To the limited extent plaintiffs raise the possibility that a certain subgroup might age out of eligibility for F2A visas, the Supreme Court's reasoning in Scialabba v. Cuellar de Osorio, 573 U.S. 41 (2014), demonstrates that such a scenario is not possible. In Scialabba, the Court observed that 8 U.S.C. § 1153(h) prevents the offspring of LPRs from aging out of the "minor child" status because of bureaucratic delays. 573 U.S. at 53 ("Taken together, [8 U.S.C. § 1153(h)(1) and (2)] prevent an alien from 'aging out' because of – but only because of – bureaucratic delays.").

injury of being prevented from enacting its preferred policy. . . . [W]e do not think DHS's inability to implement a standard that is as strict as it would like outweighs the wide-ranging economic harms that await the States and Organizations upon the implementation of the Rule.").

### C. Likelihood of Success

None of the challenges plaintiffs raise are viable.  Given the limited resources and the defendants' inability to meet the visa floors set by the INA, Congress's guidance permits the State Department to prioritize certain visas over others.  As a result, the Department acted within its lawful authority and properly allocated its resources, did not arbitrarily and capriciously design its policy, was not required to undergo notice and comment rulemaking, and has yet to cause an unreasonable delay.

#### 1. Ultra Vires Action and the Withholding of Adjudications

As this Court has outlined in the Background section supra, the pandemic placed an unprecedented strain on the defendants' visa processing resources.  This strain has caused two developments: first, the number of visas issued dramatically declined; and second, the backlog of individuals requiring visa related appointments grew to an unprecedented level.  In July 2021, the State Department returned to processing visas at pre-pandemic rates, but it is still incapable of complying with all the INA's visa floors or eliminating the crippling backlog of cases.

From January 2021 to September 2021, foreign posts issued a total of 268,679 visas.  At this pace, defendants are on track to issue between 350,000 and 400,000 visas for all of 2021. Before the pandemic, defendants' total visa adjudication regularly exceeded the INA's "permeable caps."  During this same time, the number of individuals awaiting visa-related appointments also ballooned from an average of 60,866 to a current backlog of 490,089.[10]  No

---

[10] U.S. Department of State, National Visa Center Immigrant Visa Backlog Report (2021), available at https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html.

matter how plaintiffs choose to allocate their limited resources, it is likely that some of the INA's

visa floors will not be met by this year's end.

In such circumstances, the prioritization of "mission critical" functions lies squarely

within the discretion of the Secretary of State.  See Heckler v. Chaney, 470 U.S. 821, 830 (1985)

(judicial review was unavailable where the Court "would have no meaningful standard against

which to judge the agency's exercise of discretion"); see generally 5 U.S.C. § 701(a)(2) (judicial

review unavailable where "agency action is committed to agency discretion by law").

The INA does not provide any binding statutory guidance on how the State Department

and other relevant agencies should act in these circumstances.  "Absent a congressionally

supplied yardstick, courts typically turn to case law as a guide."  Sarlak v. Pompeo, No. 20-cv-

35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020).  Generally, "Congress has given the

agencies wide discretion in the area of immigration processing."  Skalka v. Kelly, 246 F. Supp.

3d 147, 153–54 (D.D.C. 2017) (citing Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015)).

The Guidance Cables leveraged this discretion and implemented a policy designed to

address the State Department's visa backlog in a manner consistent with the INA's objectives.

Guidance 702 requires foreign posts to dedicate at least 75% of visa-related appointments to

addressing the IR visa backlog.  Guidance 220 provides the basis for this decision by observing

that Congress originally believed the adjudication of IR visas should take 30 days and other

family preference cases should be processed within 60 days.  Pub. L. 107–228 § 233(a); see, e.g.,

Milligan v. Pompeo, 502 F. Supp. 3d 302, 318 (D.D.C. 2020) ("Congress required the State

Department to have a policy of adjudicating K-1 visas 'within 30 days of the receipt of all

necessary documents from the applicant and the Immigration and Naturalization Service,' it did

not mandate a statutory deadline for K-1 visa adjudications."); Xiaobing Liu v. Blinken, No. 21-

cv-629, 2021 WL 2514692, at *15–17 (D.D.C. June 18, 2021) (finding that the timelines provided by Congress in 8 U.S.C. § 1571(b) were nonbinding, but relevant evidence of Congress's priorities).

The Guidance Cables' approach and reasoning is further bolstered by the INA's structure. Although 8 U.S.C. § 1153(e)(1) explicitly states that the non-IR family preference visas regulated under § 1153 "shall be issued to eligible immigrants in the order in which a petition [o]n behalf of each such immigrant is filed," the statute is silent as to how IR visa applications should be processed in this scheme. If Congress wanted the State Department to order and address IR and other family preference visas equally and by the date of their submission, it would have explicitly said so. Cf. Rahman v. McElroy, 884 F. Supp. 782, 786 (S.D.N.Y. 1995) ("The statute governing the allocation of immigrant visas subjects only family- and employment-based immigrant visa petitions to a 'first come first served' requirement. The subsection governing diversity visas, 8 U.S.C. § 1153(c), does not subject the Government to such a requirement." (cleaned up)). Thus, by prioritizing the IR visa backlog, the Guidance Cables came as close as possible to maintaining the INA's stated and implied priorities despite the resource constraints cause by COVID-19.

Plaintiffs contend that the INA's text demands that the State Department issue approximately 87,900 F2A visas each year come hell or high water. They reach this conclusion because the statutory language setting the visa floors in 8 U.S.C. § 1153(a) mirrors the same language in budget provisions mandating that the president dedicate a stated "maximum allotment" of monies.

As far as the language is concerned, plaintiffs are right. Section 1153(a) provides that the Second Preference Family Visa category "shall be allocated visas in a number not to exceed

114,200."  In the budget context, the phrases "shall be allocated" and "not to exceed" have been found to require the executive to allocate the entire amount of funds provided by the statute in the year those funds are allocated by Congress.  See Train v. New York, 420 U.S. 35, 41–42 (1975).

However, visas are not currency and there is no INA equivalent to the Congressional Budget and Impoundment Control Act, 31 U.S.C. § 1301 et seq.  Unlike money, which can be allocated and spent relatively quickly, each visa takes time to process.  At this moment, many of the Department's foreign posts have yet to fully restart their operations following the pandemic. The Guidance Cables acknowledge that the current limitations in Department resources require exceptional measures and tradeoffs.  This is partially demonstrated by Guidance 220's division of visas into four tiers and Guidance 702's mandate that "posts with an IR backlog should . . . allocate at least 75% of each month's appointments to backlogged IRs."  The language in the Guidance Cables implies that once the IR backlog is addressed, a foreign post will have more discretion in its allocation of visa appointments.  Relatedly, Department policy also recognizes that the challenges faced by foreign posts can vary substantially.  As a result, individual foreign posts can obtain approval to vary from the Guidance Cables' priorities if they demonstrate a need to do so.[11]

Plaintiffs point to a recent increase in the number of total immigrant visas issued by defendants and claim these numbers prove many foreign posts can restart normal visa operations. Plaintiffs also observe that several consulates and embassies have produced data showing that

---

[11] At oral argument, plaintiffs adopted the position that the pandemic is nearing its end and the priorities outlined in the Guidance Cables cannot be maintained indefinitely.  This argument has some attraction.  But the Guidance Cables have only been in place for approximately a year and seek to address a massive administrative backlog.  For their part, plaintiffs have, at most, only waited two years for their visas. During one of those years, a global pandemic caused a worldwide shutdown of consular and embassy operations.  Cf. Almakalani v. McAleenan, 527 F. Supp. 3d 205, 225 (E.D.N.Y. 2021) ("[C]ourts in this circuit have repeatedly found that delays of as long as five years in USCIS's adjudication of immigration benefits are not unreasonable.").

they have issued more IR visas starting in July of this year than during the same period in 2019. Plaintiffs use this data to argue that the State Department is forcing consulates and embassies to expend resources addressing the IR backlog when it should be restarting normal operations and attempting to meet the INA's required visa floors.

This position is also insufficient to support an injunction. Even if multiple embassies and consulates have successfully increased their monthly number of immigrant visa adjudications, defendants could still be incapable of meeting most of the INA's annual visa floors. If more consular or embassy resources were dedicated to adjudicating pending F2A visas, the Department would merely meet one INA mandated visa floor by choosing to miss another. Given these severely constrained resources, it is still within the State Department's discretion to determine how foreign posts set their priorities and what operations these posts should restart first. See Heckler, 470 U.S. at 830.

### 2. Arbitrary and Capricious

Plaintiffs also bring three Administrative Procedures Act (APA) arguments challenging the Department's policy on the grounds that it is arbitrary and capricious. Specifically, plaintiffs contend that: (1) the Department's policy does not have a basis in the laws passed by Congress; (2) there is no rational explanation for prioritizing IR visas over F2A visas; and (3) the scheme designed by the State Department upends the INA's requirement that approximately 87,900 F2A visas be issued annually. Because these arguments are essentially variations on the issues discussed above, this Court will address them together below and briefly explain why it rejects plaintiffs' challenges.

As consulates and embassies around the world begin phasing in regular services, they will need to address an unprecedented backlog in visa appointments across multiple categories.

Relatedly, these foreign posts still lack the resources to fully resume regular operations.  Thus, the State Department must determine which visas to prioritize.

Neither party disputes that family reunification is a chief priority of the INA.  Given this priority, it stands to reason that the Department would dedicate more resources to issuing both IR and Family-Sponsored Preference visas over other types of visas.  The tiered structure outlined in Guidance 220 does this.  It places IR visas in Tier Two of Four and F2A visas in Tier Three of Four.

The next question then becomes, why are IR visas prioritized over F2A visas?  On this point, Congress has specifically provided guidance that IR visas should be adjudicated within 30 days, while other family preference cases should be resolved in 60.  See Pub. L. 107–228 § 233(a).  Additionally, while the INA clearly requires family preference visas (including F2As) to be addressed in the order they are submitted, see 8 U.S.C. § 1153(e)(1), it does not subject IR visas to this framework – suggesting, in conjunction with Pub. L. 107–228 § 233(a), that Congress wanted IR visas to be prioritized.

Apart from these procedural and statutory distinctions, the only difference between the IR and F2A categories is that the former is provided to the spouses, minor children, and parents of a U.S. citizen and the latter is given to the spouses and minor children of an LPR.  This distinction is sufficient for Congress or the Executive to institute disparate treatment.  Cf. Mathews v. Diaz, 426 U.S. 67, 79–80 (1976) ("In the exercise of its broad power over and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").  Thus, in placing IR visas in the second tier and determining that 75% of all visa-related appointments should be dedicated to addressing the IR backlog, the Department acted within its discretion to prioritize IR visas given the limited resources caused by the pandemic.

3. <u>Notice and Comment Rule Making</u>

Plaintiffs also bring a second claim under the APA.  They contend that the State Department failed to meet the substantive rulemaking requirements of 5 U.S.C. § 553 when it promulgated the Guidance Cables at issue in this case.  Because the Guidance Cables are not substantive rules, this Court rejects plaintiffs' contentions.

The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. § 551(4).  "The APA's notice-and-comment requirements apply only to 'substantive' . . . rules."  <u>Time Warner Cable Inc. v. FCC</u>, 729 F.3d 137, 168 (2d Cir. 2013).  "When determining whether an agency action is subject to the notice-and-comment exemption under Section 553, the court looks not to labels given by the agency, but rather to the nature of the impact of the agency action."  <u>L.M. v. Johnson</u>, 150 F. Supp. 3d 202, 215 (E.D.N.Y. 2015) (citing <u>Lewis-Mota v. Sec'y of Labor</u>, 469 F.2d 478, 481–482 (2d Cir. 1972)).  "Substantive rules 'create new laws, rights, or duties, in what amounts to a legislative act.'"  <u>See</u> <u>Time Warner Cable</u>, 729 F.3d at 168 (quoting <u>Sweet v. Sheahan</u>, 235 F.3d 80, 91 (2d Cir. 2000)).  Procedural rules do not alter the rights or interests of parties, although they may alter how the parties present themselves or their viewpoints to the agency.  <u>Id.</u>

In this instance, the Guidance Cables operate as a set of procedural rules.  They do not alter the law or change any of the parties' rights, interests, or duties.  Rather, these two cables provide State Department officials with guidelines for prioritizing visa adjudication and visa-related appointments.  Neither of these two bureaucratic priorities meaningfully shift plaintiffs' substantive rights to obtain F2A visas.  Rather, they only change when plaintiffs are likely to

receive their visa-related appointments and adjudications. Thus, because these cables do not affect plaintiffs' substantive rights, they are exempt from § 553.[12] See L.M. v. Johnson, 150 F. Supp. 3d at 215; Aluminum Co. of Am. v. FTC, 589 F. Supp. 169, 178 (S.D.N.Y. 1984). If plaintiffs' want to show that this Department policy has meaningfully affected their substantive rights to pursue F2A visas, then they must demonstrate unreasonable delay.

    4. Unreasonable Delay

Courts in this Circuit generally evaluate claims that agencies have unreasonably delayed adjudicating plaintiffs' pending administrative matters by applying a six-part standard set forth in Telecomm. Rsch. & Action Ctr. v. FCC ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984). Under that standard:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

TRAC, 750 F.2d at 80 (cleaned up); see Almakalani v. McAleenan, 527 F. Supp. 3d 205, 224 (E.D.N.Y. 2021); Altowaiti v. Wolf, No. 18-cv-508, 2021 WL 2941753, at *5 (S.D.N.Y. July 12,

---

[12] There is no contradiction between this Court's finding that plaintiffs have suffered a concrete injury for standing purposes and its finding that the Guidance Cables do not affect plaintiffs' substantive rights. See, e.g., El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev., 959 F.2d 742, 748, 751–53 (9th Cir. 1991) (finding defendant's alleged policy and practice sufficient to demonstrate Article III standing because it required plaintiff to expend resources, but concluding that defendant's policy did not violate the INA and therefore did not affect plaintiff's substantive rights); cf. Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 33, 45–47 (D.D.C. 2018) (finding alleged procedural violations sufficient to demonstrate standing, but then proceeding to acknowledge that plaintiff's APA notice and comment claim could fail if the memorandum at issue did not effect plaintiff's substantive rights).

2021); <u>N-N v. Mayorkas</u>, No. 19-cv-5295, 2021 WL 1997033, at *13 (E.D.N.Y. May 18, 2021); <u>Al Saidi</u>, 2021 WL 2515772, at *3.

The first two <u>TRAC</u> factors favor defendants.  Whether a rule constitutes a rule of reason "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  <u>Mashpee Wampanoag Tribal Council, Inc. v. Norton</u>, 336 F.3d 1094, 1102 (D.C. Cir. 2003).

As discussed in detail above, the State Department has a herculean task before it.  First, it must manage the phased reopening of consular and embassy services in a manner that accounts for home-country dynamics, local health guidelines, and CDC recommended safety procedures. Next, it needs to implement a strategy so each embassy or consulate can assess its visa backlogs, set its priorities, and determine how best to proceed with the available resources.

In this context, the Guidance Cables provide a well-reasoned plan to address the complex problems following the decision to substantially limit embassy and consulate operations during the height of the COVID-19 pandemic.  These two documents also rely heavily on the INA and related congressional guidance.  As a result, Department policy prioritized family reunification over the INA's other three policy goals and, based on the congressional guidance stemming from Pub. L. 107–228 § 233(a), instructed embassies and consulates to dedicate 75% of their visa-related interviews to addressing the backlog in IR visas.

The third and fifth factors, which courts generally analyze together, also favor defendants.  <u>See, e.g.</u>, <u>Geneme v. Holder</u>, 935 F. Supp. 2d 184, 194 (D.D.C. 2013).  When these factors concern "plaintiffs' welfare," the "nature and extent of [plaintiffs'] interests" and the

degree to which plaintiffs have been "prejudiced by delay" must be closely considered.  TRAC, 750 F.2d at 80.

Although only 25% of non-IR visa-related appointments currently exist to address other visa applications, the expectation is that the policy will only be in effect until an embassy brings its IR visa-related interview backlog to a manageable level.  As noted above, this allocation of resources has only been in effect for approximately a year and plaintiffs have been waiting at most for two years.

Plaintiffs' interests in reuniting with their families are substantial and there is little question that plaintiffs and their families' welfare are at stake while they wait to be reunited.  However, in the context of family immigration, approximately two years is not an unreasonable waiting period absent exigent circumstances.  See Cuthill v. Blinken, 990 F.3d 272, 274 (2d Cir. 2021) (observing that after a sponsoring parent files a petition on Form I-130, "[t]he process can take up to a year or more."); Almakalani, 527 F. Supp. 3d at 225 ("courts in this circuit have repeatedly found that delays of as long as five years in USCIS's adjudication of immigration benefits are not unreasonable.").  Thus, the third and fifth TRAC factors weigh in defendants' favor because plaintiffs have not demonstrated that the current length of their delay amounts to prejudice.

As to the fourth factor, an injunction eliminating the procedures established by the Guidance Cables would constitute a minimal intrusion on the agency's activities.  If the State Department's policy was lifted, foreign posts would be required to treat F2A visas on par with IR visas.  This would cause their immediate caseload to grow.  But if the current policy was maintained, consular and embassy officers would likely be required to address the F2A visa

backlog after they finished with the IR visa backlog.  As a result, introducing F2A visas into the workflow now would be unlikely to meaningfully change Department procedures or priorities.

Lastly, plaintiffs contend that defendants acted with impropriety because they never examined the families' harms and deferred reviewing their visas without a rational explanation. Generally, a "court need not find any [impropriety] . . . to hold that agency action is unreasonably delayed."  TRAC, 750 F.2d at 80.  But in this instance, this Court finds that defendants have acted in good faith and nothing in the record suggests error in the State Department's approach to promulgating the Guidance Cables at issue here.

After reviewing each of the TRAC factors, it is evident that this analysis favors defendants.  Save for the fourth element, every TRAC component supports the conclusion that plaintiffs have not been prejudiced by unreasonable delay.  Cf. N-N v. Mayorkas, 2021 WL 1997033, at *13 ("It is settled, however, that the mere passage of time cannot sustain a claim of unreasonable delay." (citing Norton, 336 F.3d at 1102)).

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is denied.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
          November 12, 2021